May it please the Court, Teresa Reneker appearing on behalf of the appellants and plaintiffs. I'd like to reserve three minutes for rebuttal, if I may. We'll try to help you, and you try to keep your eye on the clock. Thank you. This ERISA benefits dispute concerns the amount of a true-up contribution, or final adjusting contribution, to a retirement plan for executives of Greater Bay Bancorp, which was acquired by Wells Fargo in 2007. The plan creates a position that it calls the Benefits Determiner. And Wells Fargo is refusing to contribute to the plan in the true-up amount calculated by the Benefits Determiner. So we had several different Benefits Determiners. Well, we had a Benefits Determiner that was originally appointed, according to the terms of the plan, by Greater Bay, the original employer. That Benefits Determiner resigned and was replaced by a Benefits Determiner appointed to the — pursuant to the terms of the plan that apply following a change in control. And those terms permit the employees acting with the trustee to appoint the Benefits Determiner. That's an important protection for the employees that is built into the plan, their right to appoint the Benefits Determiner following a change in control. That protects them from exactly what Wells Fargo is trying to do now, that is, from a successor employer seeking to minimize its contribution obligations to the plan. The plan actually protects its participants' benefits in two ways. One way is that it protects them against an interest rate decline before retirement by requiring the true-up contribution. And the other protection is that in the event of a change in control, they get to appoint the Benefits Determiner who calculates the employer's true-up obligation. The plan charges the Benefits Determiner with the responsibility to determine the amount of payments to be made to the employees and their beneficiaries under the trusts that fund the plan. So far we keep talking about, or you keep talking about, the determination by the Benefits Determiner. Is the determination by the Benefits Determiner binding on the plan? Yes. Without any ability to question it, that is to say if it's inconsistent with the terms of the plan, it's nonetheless binding? I think that if Wells Fargo's contention, you know, for example, if the Benefits Determiner did something completely unauthorized by the plan, such as saying you need to make a true-up contribution of the necessary funding times 10, then Wells Fargo would have a claim that the Benefits Determiner had acted outside his authority. Right. So in other words, the Determiner does not the final say. If the Benefits Determiner does something inconsistent with the plan, that doesn't necessarily govern. I think that the Benefits Determiner could not do something that's flatly inconsistent with the plan, but the Benefits Determiner does have the right and the authority to determine the amount of payments under the plan, and that's what this case is about. But then who gets to determine what the plan says? As distinct from the calculation, who gets to determine whether or not the Benefits Determiner determination was consistent with the plan? The Benefits Determiner, well, the court could do it ultimately. But isn't there a plan administrator? Well, Wells Fargo is the plan administrator. Right. And so doesn't the plan administrator get to say, well, we don't think the Benefits Determiner is right, and then I guess we're trying to figure out whether or not the administrator is correct? No. I don't believe the plan administrator gets to say, we disagree with the way that the plan, that the Benefits Determiner has performed his responsibility. But who does get to decide? Anybody within, before it gets to court? Is there anybody before it gets to court who gets to decide whether the Benefits Determinator is acting consistent with the plan? No. The Benefits Determiner has that authority. If Wells Fargo has the ability as a successor employer to overrule the Benefits Determiner, then the change in control protection is an empty promise. It's an illusory provision of the plan. So we can't interpret the plan to contain a provision. But does it just make it more difficult for Wells Fargo to reject what the Benefits Determinator does? Yes. But, I mean, it seems like what you're saying is that they can't reject it. That is what I'm saying. They cannot reject it. But it seems like if the Benefits Determinator does make a determination, Wells Fargo disagrees with it, then the whole dispute is, what does the agreement provide for? Yes. And that's why we're here. That is why we're here. Right? And what standard do we apply to a determination by Wells Fargo? Do they get any discretion in determining whether to accept the determination by the Benefits Determinator? They do not. Because? Because the plan terms that confer discretion on Wells Fargo are clear that the discretion is only conferred with respect to the unfunded portion of the plan. So the grant of discretion states that it is as to the compensation agreements and as to the, what it calls the executive plan, which is defined as the unfunded portion of the plan. This dispute concerns the funded portion of the plan, the trusts. The trust agreements are controlling over the compensation agreements that confer discretion, and the trust agreements are the documents that confer the authority on the Benefits Determinator. Okay. So what language in the plan works to your advantage? Now, who are you relying on? Works to our advantage regarding the grant of discretion? Well, no in terms of the correctness of the determination by the Benefits Determinator. Sure. So the language in the plan that states that the plan can provide death benefits through the trust. I'm not sure about can. I think you're already going must. Well, the Benefits Determinator has interpreted it as requiring that determination, and we know that. So what language is it that you're relying on? What provision in the agreement? Well, the agreement, the schedules to the compensation agreements and the exhibits to the trust agreements, which are parallel, set forth funding requirements for the plan, and they set forth specific amounts that are to be contributed for those participants. And we know from looking at the benefits projections that were provided to those participants that those precise amounts that are set forth in those exhibits and schedules, those contribution amounts, are the contribution amounts that were projected to fund not only a stream of retirement income, but also a death benefit, a death benefit, you know, for example, in Mr. Smith's case. I'm going to ask the question again. What language in the plan or agreement are you relying on? Well, the numbers, I guess, are language, I think. I'm not interested in just the numbers. I'm interested in what language tells us that those are the numbers we're supposed to look at. Because what you're saying is that there's basically an independent death benefit, and how do I know that looking at the agreement of the plan? You know it from the fact that the plan was originally funded to provide that. No, I keep asking you for language, and you keep giving me things that aren't the language. Is there no language that works in your favor? There is language that works in our favor. Okay. Where is it, and what is it? The language that, in the compensation agreement and in the trust agreement, that says that the trust agreement, for example, is designed to provide death benefits. Do you have the plan in front of you? Yes. I'm asking for you to put my nose in the language. So, for example, on ER-296, which is the first whereas clause of the Burgess trust agreement, it states that it is the desire of the grantor to provide funds for the benefit of certain designated beneficiaries in the event of the grantor's death. And that doesn't tell me much about whether there's supposed to be a defined benefit of life insurance at the end. That doesn't say much. I'm looking, for example, at the supplemental compensation benefits agreement. I'm looking at Roman 2. No death benefits are provided under this agreement except for any supplemental benefits provided through a secular trust pursuant to paragraph Roman 9. So where's paragraph Roman 9, and what does it say? Paragraph Roman 9 describes the creation of the secular trusts. So it says that it shall provide supplemental benefits specified in Schedule C. Schedule C is the schedule that I'm referring to. So I'm looking at ER-280 is where, in the Burgess trust, ER-280 is where. Hang on, okay. I'm on 280, and now what language are you looking at? I'm in Roman 9, okay? Yes, I'm looking at the language that says the employer shall provide to employee or employee's beneficiary the supplemental benefits specified in Schedule C. Schedule C is the schedule that I'm referring to where, for example, if we look at Mr. Smith's schedule, which is on ER-231, and compare it to — excuse me, that's his projection on ER-231. We compare it to the schedules on ER-380 and ER-410, and we see that the contribution amounts that are specified in the compensation agreement and in the trust agreement are those that are required to fund a retirement income stream followed by a $4 million death benefit. So put my nose in Schedule C, would you? Sure. So there's a Schedule C for Mr. Smith on page ER-380 in the same volume. I'm sorry, in Mr. Smith's it's called Schedule A. I may not have that. Do you have it for Burgess? Yes, Burgess's schedule. We're taking you over time, but don't be nervous about that. Okay, thank you. Burgess's Schedule C is on ER-291 in the same volume. Okay. And where in this — I have trouble looking at Schedule C, reading this to tell me that there is a separately defined death benefit. Where do I find that? So we find that from the fact that the net annual contribution to trust that is listed there, these annual contributions, are the contributions that at this time in 2003 were the contributions required to fund both a retirement income stream and a death benefit. Where does it say that this is going to death benefit on Schedule C? It does not say it on Schedule C, but there's a latent ambiguity on Schedule C because the contribution amounts are those that are required to fund a death benefit. Well, so where does it say here on Schedule C or anywhere else that it's required to fund a death benefit? Again, we know that from the dollar amounts, comparing them to the projections for the employees. But we're working our way through. We started at Roman 2. Roman 2 says no death benefits are provided under this agreement, except for supplemental benefits provided through secular trust per 200 paragraph Roman 9. And then we read Roman 9, and you said, well, but Roman 9 incorporates Schedule C, and I look to Schedule C, and I don't see either in Roman 9 or in Schedule C any separate textual provision saying that they're death benefits. I see some numbers, but I see nothing that refers to death benefits. Right. The numbers create an ambiguity in the plan, and there's an ambiguity anyway because the death benefits are not. Well, I'm not sure I see an ambiguity because Roman 2 says no death benefits except Roman 9. Roman 9 says the only thing you get is Schedule C. I look at Schedule C for death benefits, and there's nothing there. I don't see how that's ambiguous. The schedule is ambiguous because the amounts required to be contributed are those required to fund a death benefit. The death benefit is not mentioned. The death benefit is not mentioned. But the plan is ambiguous. That requires resort to extrinsic evidence, and we've reviewed the extrinsic evidence in our brief. And what's the extrinsic evidence that you're relying on? The plan summary? The plan summary, the plaintiff's declarations, the declarations of two other officers. I read the plan summary. I don't see it there in the plan summary either. Well, the plan summary does say 100 percent of the death benefits specified in the. . . Okay. Show me where we are talking about the plan summary. Okay. We are talking about the plan summary on . . . I've got the one for some reason for Stephen Smith on ER 241. Would that suit your purposes? Again, you know, we're running over time. Actually . . . What do we need to do? Yes. Actually, on 441 is a plan summary that refers to, and this is cited in our brief, it states that the plan provides 100 percent of the death benefit proceeds specified in the insurance policies owned by each participant's secular trust. And in addition to that language, we know from Wells Fargo's own analysis that their analyst concluded that in order to fund the trust in the way that Wells Fargo wants to do, the policies would have to be changed. Those analyses from NFP say policy service is going to be required to reduce the death benefits that are in those policies in order to accommodate the lesser amount of funding that Wells Fargo wants to provide. Okay. Why don't we hear from the other side? You sought to reserve three minutes. We'll give you three, even though we took you over. Thank you, Your Honor. Does the Court wish any argument on the cross-appeal pertaining to the fees? There's no fees. Speaking for myself, no. No.  Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Jeff Sturgeon on behalf of the Greater Bay Benefits Plan and Wells Fargo. The central question before this Court is whether the benefits plans at issue provide for the benefits that the former executives seek. What they seek is a guaranteed death benefit. They seek that in addition to the benefits that are actually provided under the plan, which is a stream of payments between the ages of 62 and 85. I'm holding up the compensation agreement and the trust agreement for Ms. Burgess, who's one of the former executive agreements. The benefits they seek, this guaranteed death benefit, are not in here. That's the reason my opponent couldn't answer that question. They're not here. Could you just — I realize here that the plan summary, executive retirement plan summary that was just discussed a minute ago? Yes. So the very — and I realize it's not part of the plan and all of that, but what was the meaning or the signal or the — it said at the bottom, on the last page, paragraph entitled Secured Plan Insurance Benefits. And then it says 100 percent of the death benefit proceeds specified in the insurance policies owned by each participant's secular trust. So if you were to read that back in the day, what was that signaling? What was that telling the participant? So setting aside the legal issues. Yes, right. I want to set those aside, Your Honor.  I understand that. Got it. But I'm just trying to figure out how somebody would read this. Sure. It's because the way that — you have to understand the way these plans work, which is a little strange. But the — the compensation agreement provides for the funding. So the bank — there's a schedule where the bank would be paying into a trust. Once that money is paid into a trust and those — that — those terms are in the trust agreement, that's the executive's money. They could actually take it out. But the way it actually practically worked was they bought life insurance. Right. As a funding mechanism. Right. And what happens was, is that — that life insurance grows. The value grows. Is there whole policy? Yes. Whole life policies? And it's a little more complicated. There are multiple policies in each person, and they — the way they grew varied. Some mirrored S&P, some — that's a little complicated, but that's a side issue. So what happens is, at age 62, that individual — there's a true-up that occurs. So the bank has to look at what's in there and apply some assumptions. There's no debate or dispute about the assumptions that were used or projections. But the bank has to say, is there enough in that life insurance to spit out these payments that are specifically provided for in the — in the compensation agreement between 62 and 85? So there actually is a death benefit there. So for — it's easy to think about it this way. Sixty-two, the true-up occurs. The former executive, unfortunately, passes away at the age of 70. Those payments, which in the case of Burgess is $72,000 a year. It differs, but it doesn't matter for the appeal. Seventy-two thousand plus 3 percent each year, it grows. There would still be money left in that insurance policy that — And that's the death benefit. That's the death benefit. I see. Right. So they're attempting to capitalize on that. They're attempting to capitalize on the funding mechanism being the issue, when really the issue is what benefits provided for in the plan? Schedule C has contributions that the bank has to make, yearly contributions. And then the bank's on the hook. That person turns 62. If — there could be way more money than is needed to meet the payments from 62 to 85, and then there's a windfall for the executives. Nobody's debating that, and that could happen. But what the bank's on the hook is, if those life insurance policies aren't growing because of the interest rate environment and the investments, the bank has to make sure there's enough in there for them from 62 to 85, based on projections and assumptions, to meet those — that 72 plus 3 percent. And that's what happened. There's no dispute about the math. What they're trying to say is, no, no, no, we are entitled to that 72 plus 3 percent plus a guaranteed death benefit in a specific amount. It's not in these agreements. It's not in these agreements, Your Honors. You can start and end there. So let me — Your Honors asked about the discretion that's afforded, and it's important, because this is — this goes to the role of the benefits determiner. So the compensation agreements provide that Wells Fargo is the named fiduciary and the plan administrator. And it says, quote, that named fiduciary and administrator shall have sole discretion and authority to decide all questions regarding eligibility for and the amount of any benefits to be provided for under the executive plan and this agreement. This agreement is referencing the compensation agreement, the plan document. This Court's repeatedly held that that language gives them discretion, gives Wells Fargo as the plan administrator and the named fiduciary, and that Wells Fargo's determination of any claim for benefits will be final and binding. I want to talk about the benefits determiner and what practically his or her role was, but whether there's a change in control or a change in benefits determiner, there's no change in the language I just read to you. There's no change in the roles and the discretion and who gets to decide what. That plan language doesn't change when the identity of the benefits determiner changes. So this the benefits determiners is delegated certain duties, and that's also provided for in the trust agreement. And what the former executives are effectively saying is because the benefits determiner, and this is in the trust agreement, can tell the trustee what the benefits determiner can now tell the bank how much money it owes into the trust. That doesn't make sense. That language isn't in there. And they're attempting to argue that the benefits determiner's role is rendered superfluous. It's actually the opposite. If the benefits determiner can tell Wells Fargo whatever amount it wants, he or she wants to put into the trust, then the language I just read to you about Wells Fargo's discretion is rendered superfluous. The former executives also rely on the fact that, well, there's some conflict between the trust agreement and the compensation agreements. There's no conflict. The benefits determiner's role is really important, because if you think about the true-up, here's what happens. Yearly contributions for 10 years before you hit 62, the bank's putting in money as specified in Schedule C. The true-up occurs. The bank looks and makes sure that there's enough money in those life insurance policies to spit out the payments going forward. But then the bank disappears. The bank no longer has any role. The money's in the trust. The executives can immediately take it out, or they can let it sit there and pay them those monthly or those yearly payments going forward. And it's a little bit in the weeds, but the district court picked up on this in the record. That's an important role, because if you take too much money out too quickly, you actually can be taxed on it immediately. So this benefits determiner directs the trustee going forward between 62 and 85, monitors the situation, protects the former executives, and makes sure that those withdrawals from the life insurance, because they're technically withdrawals, they're going to be taxed, that those amounts don't result in tax implications. So his or her role is clearly defined. It's limited. It's limited by the plan documents. It's limited by the trust language. It doesn't result in any conflict between the trust agreement and the compensation agreement. So the former executives rely heavily on extrinsic evidence in this case, and the district court in a thorough opinion said, well, the benefit's not in there, so I don't really get there under the case law, but let's look at it anyway. I'm not going to go to the plans, talk about the issue in the plan summary that Your Honor just pointed out, but there's another provision in there, and the district court wrestled with this provision, and it's on top of ER-442 under withdrawals. And it says, quote, The only way to read that is you're taking the money from the life insurance to satisfy those exact amounts that are in the agreement between 62 and 85. When you take money from a life insurance policy, the death benefit goes down. It's wasting. That's the way to read that language. So the district court said, look, even this plan summary, which I can't consider under AMARA, setting all the legal issues aside that we briefed, Your Honor, I shouldn't be considering this, but even that doesn't get you there. The district court also looked at the former executives' declarations and that they submitted declarations saying we expected this, and they gave, the district court gave that the weight it deserves. But then it looked a little closer, and it looked at things like, well, what did Greater Bay Bank Corp. do in proxy statements before Wells Fargo took over? Lo and behold, Greater Bay Bank described these plans, no mention of an independent death benefit of a specified death benefit. They described them exactly the way they exist in the plan. Well, they looked at projections because the former executives said, hey, we were given projections when we were at Greater Bay Bank, and those projections show that there's a big death benefit at the end. After 62 to 85, we get our money, there's a big death benefit. That's evidence that you're guaranteeing us a death benefit. Well, if you really look hard at those projections, some of them, it depends on the interest rate environment, you don't really know, it's the idea of a proxy, which obviously the district court said, well, that kind of contradicts your point that there's some guaranteed amount of death benefit. If Michael Corrigan, who fully supported Wells Fargo's reading of the plan before he got cold feet and resigned and another benefits determiner was appointed, that shows that Mr. Corrigan, when he's giving you those projections, is saying to you that there's no guaranteed specific amount of death benefit. So, Your Honors, I would like to pivot quickly with my remaining time to talk about the motion for attorneys' fees, where we are the appellant. And the argument on this is there's really two arguments. The second relates to the Hummel factors, and I'd like to rest on our briefs on that. I don't want to argue that here today. But the issue I do want to bring to the Court's attention is that these compensation agreements, which were individual to each executive, so this isn't like a benefits plan that Your Honors see quite often where there's 5,000, 10,000 participants, everybody's in. These are individual to each person, meaning each former executive signed a compensation agreement, signed a trust agreement, bargained for it with their former employer who these compensation agreements have a prevailing party attorneys' fees provision. And for some reason, the district court said that doesn't govern. I'm looking back to ERISA. Correct. So why do you think they govern? Why do you disagree with the district court on this point? So the reason I disagree is because I don't see a conflict between that provision and ERISA's provision, and let me explain why. I think you have to take into account that provision. ERISA has a provision in — about attorneys' fees that say the district court in its discretion may award attorneys' fees. This is obviously different. It says shall. These former executives specifically bargained for it, meaning it was a — they had an individual agreement with their former employee that had a prevailing party attorneys' fees provision. And I think what the district court did was it — it relied on a very, very narrow reading of Hyman's Hoff, which is a Supreme Court case. And in that case, the Supreme Court said the plan at issue had a statute of limitations in it. ERISA is silent about a statute of limitations on when — how soon you need to bring your claims. We feel comfortable enforcing that statute of limitations. Now, obviously, this — ERISA isn't silent on attorneys' fees. It has a provision in it. It's a may provision. But it doesn't conflict. Individuals are free to contract as they wish. There's no conflict between may and shall. Shall is upping the game. So I think when the district court in the beginning of their opinion said it's irrelevant that the compensation agreements have this shall provision, I think the district court erred. I don't — I think that's too narrow of a reading of Hyman's Hoff. And the Supreme Court in that case noted at the beginning of its opinion that really what matters in ERISA more than anything else is what's in the plan. And the court has no discretion but to award attorneys' fees if the participant is a prevailing party. Is that your position? It's a fair question. I do think it has discretion. I do think that the court could look and say there's something inequitable or inequitable about this situation that I don't feel comfortable awarding attorneys' fees. I think the court does. But I think the court has to take into consideration that these parties negotiated for a prevailing party attorneys' fees provision. Let me understand what you just said. You're saying that the fact that they entered into this agreement is not in itself determinative as the entitlement to attorneys' fees? It has to be considered. I think under — it has to be considered in the context of ERISA. ERISA has a may provision. And are you saying the district court did not consider that in the context of the entire case? She noted it in her opinion on attorneys' fees, but she said this prevailing party attorneys' fees provision was irrelevant to her determination. It has to be relevant. It has to be a factor. So she considered it, then? Well, yeah. I don't want to parse words. We put it before her. She noted it, but then immediately dismissed it as irrelevant. And my point to the panel is it can't be irrelevant. It has to be part of the mix here, because it doesn't conflict with ERISA. And I think that her big one — Well, what to the extent that — well, never mind. To the extent you're — you even suggest that it would constrict the district court's discretion, then there's, I see, a conflict. But that's not your position. It is not, Your Honor. Okay. I'm out of time. Thank you, Your Honor. Let me ask you one quick question. What are we talking about, roughly, in terms of the amount of fees attorneys' fees sought? We didn't put that before the court. So we — under local rules, we didn't put the actual amount. So it's not in the record. Okay. Got it. Thank you, Judge. You've got — you've got three minutes now. Listen up in terms of time allocation. Let's have three minutes with respect to your appeal, and then a couple of minutes if you wish to respond on attorneys' fees. And then if you need a response after that, because we've got cross-appeals, you can — you'll have a minute or two. Great. Thank you. Very good. Thank you, Your Honor. With respect to the extrinsic evidence regarding the death benefit, it's uniform. The — when the plan summary says that 100 percent of the death benefit proceeds specified in the policies, that's not the same thing as saying whatever's left over when you die. There's a specified — It depends on what's specified on the policy. Exactly. And that's very clear. And what is specified on the policy? As I read the policy, it sounds to me as — it reads to me as though it was argued for by the Wells Fargo people. Well, what's specified in the life insurance policies that fund the trust, and that's what — that's what the plan summary is referring to, 100 percent of the death benefit proceeds that are specified in the policies that fund the plan, those death benefit proceeds are listed in both NFP's reports and the Benefits Determiners' reports. That's where they start. They say, what are the — what are the death benefit proceeds, and do they have to be met or don't they? You know, it's interesting that, you know, Wells Fargo's position is we have to leave a 50 — a $50,000 death benefit in these plans. That's not specified in the compensation agreement or the trust agreement either. There's nothing in there that says these — the true-up contribution has to be calculated so as to fund a $50,000 death benefit, and yet that is what Wells Fargo wants to do. So the dispute is really not whether there's a death benefit. It's how much is it. Is it $50,000, or is it 100 percent of the death benefits that are specified in the policies? I would like to respond on the proxy statement very briefly and the other items of extrinsic evidence. I mean, it's absolutely clear that Greater Bay and the employees believed that they were funding for 100 percent of the policy — the death benefit proceeds specified in the policies. The plaintiffs gave up other life insurance because they believed that that life insurance was redundant of what they were being provided under this plan. The proxy statement, well, we have three pages of 62 of that proxy statement. It talks a lot about how the retirement benefits are going to be funded, and it doesn't talk about life insurance benefits in those three pages that we have, but that really doesn't help us to understand what Greater Bay was intending, and Greater Bay wrote it down in the plan summary and in other documents that this death benefit was intended to be provided, that it was going to be there for these employees at the conclusion of their retirement income stream. Okay. Now, would you like two minutes to respond on the question of fees and the consequence of the agreement as to fees? Sure. So the fees that are sought are specified in the defendant's fee motion. It's $363,000 and change. So they did request a specific amount of fees. Yeah. I'm less interested in the amount than I am in entitlement fees. So the agreement is inconsistent with ERISA because it says that it shall — that — So why is that inconsistent? ERISA says may. Right. ERISA says may. The Court has to exercise discretion, and this Court and every other circuit has specified a five-factor test to guide the Court in exercising that discretion. And the party — and you're saying the party simply cannot contract out of the may language? That's correct, yes. They cannot contract out of it. And that's what Heimschaft says. That's Heimschaft v. Reliance Standard. The — Heimschaft says that the parties can contract for a statute of limitations because ERISA doesn't provide one. So there's no controlling — there's no controlling statute to the contrary. But if the agreement is saying that attorneys' fees shall be provided to the prevailing party, the Court — the prevailing party shall receive fees, that is contrary to the controlling ERISA language that says the Court may award fees. And it's also contrary to the language of ERISA that says that a party need not prevail in order to receive fees under ERISA. Under Section 502G, as the Supreme Court says, there doesn't need to be a prevailing party to receive fees under this provision, and the contractual provision is to the contrary. So the contractual provision really doesn't have anything to add to the analysis that the district court performed under Section 502G. Okay. We get the argument. Thank you. Thank you, Your Honors. And if you have a response and you would like a minute, but now just on the question of fees. Yes. I can be less than a minute, Your Honors. First of all, I was incorrect — I was correct that we didn't submit detailed time records, but there is, my colleague pointed out to me, as my opponent pointed out, there's more than 300 fees in the record. So I wanted to correct that. But the other point, just very briefly on — on Himeshoff, it's not limited to when ERISA is silent. That's a narrow reading of the case. What Himeshoff said is parties can contract for things if it's not — unless it's inconsistent with ERISA. And that's my point, that this contracting for a shale provision is not inconsistent with the May provision. Thank you, Your Honors. Okay. Thank you. Thank you. Thank both sides for your helpful arguments. The case of Black v. Greater Bay Bank Corp., et cetera, now submitted.
judges: W. Fletcher, Paez, Choe-Groves